## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **RANDSTAD GENERAL PARTNER** | § | |
| **(US), LLC and RANDSTAD TECHNOLOGIES,** | § | |
| **LLC.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION FILE NO.:** |
| **v.** | § | **3:20-cv-02814-N** |
| | § | |
| **BEACON HILL STAFFING GROUP, LLC,** | § | |
| **SHAWNA BESTREICH, ANDREW WANG,** | § | |
| **and DOES 1-10.** | § | |
| | § | |
| **Defendants.** | § | |

### AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Randstad General Partner (US), LLC and Randstad Technologies, LLC (collectively, "Randstad") file this Amended Complaint for Injunctive Relief and Damages ("Complaint") against Defendants Beacon Hill Staffing Group, LLC ("Beacon Hill"), Shawna Bestreich, and Andrew Wang ("Wang" and, with Bestreich and Beacon Hill, "Defendants").

### INTRODUCTION

1.       Unable to grow its business organically quickly enough, develop talent from within, or compete fairly with Randstad based upon the quality of its services, Beacon Hill has continued to raid Randstad of its employees, knowing full well that these employees are subject to post-employment restrictive covenants and non-disclosure obligations that multiple courts have found enforceable, including late last month. *See, e.g.*, *Randstad Techs., LLC v. Lisette Robles*, No. 2020-0105987 (Ga. Super. Ct., Cobb Cty.) (Sept. 30, 2020); *Randstad Techs., LLC v. Luma,* et al., No. 18106542 (Ga. Super. Ct., Cobb Cty.); *Randstad General Partner (US), LLC*

*v. Volt Workforce Solutions, LLC*, No. 17108166 (Ga. Super. Ct., Cobb Cty.), *Randstad Professionals US, LLC v. Joseph Tamberrino,* et al., No. 1:18-cv-940-ELR (N.D. Ga.).

2.     Since 2016 alone, Beacon Hill has hired dozens of Randstad employees and has targeted many more. Indeed, even after Randstad filed a lawsuit in Georgia in March 2019 (the "Georgia Litigation"), which remains ongoing, Beacon Hill hired multiple Randstad employees in violation of their restrictive covenant agreements and has targeted and solicited dozens if not over 100 more—despite being actively involved in litigation with Randstad regarding the very same agreements and conduct.

3.     The purpose of this scheme is to compete unfairly by gaining access to and exploiting Randstad's (and other competitors') confidential information, trade secrets, and customer and Talent goodwill which is otherwise protected by restrictive covenant agreements.

4.     Beacon Hill's improper and illegal conduct is not limited to a single rogue manager or division, nor is this case. Rather, Beacon Hill's business model, as formulated and implemented by its Chief Executive Officer, Andrew Wang, is to intentionally violate or willfully ignore restrictive covenants, as admitted by its own 30(b)(6) corporate representative during the Georgia Litigation:

Q.     Do you care at all whether an employee has a restrictive covenant agreement?

A.     I don't ask about it in the interview process.

Q.     Do you ask about it ever?

A.     If it comes up in litigation and we've been sued, we have conversations with counsel about whatever agreements they may have had with their previous company.

Q.     But until you get sued, it's not something that you worry about?

A.     It's not -- I don't ask about it in the interview process, which is what I think you're asking me. And I don't ask about it once they've started with our

2

company. I focus on if they're going to be a good fit for us, and ultimately if an issue comes up that is related to their previous employment, generally I would send that to counsel. If it looks like it was written by a lawyer, I'm going to send it to a lawyer for interpretation and -- and reading, and I'm going to focus on the business of what I do within our group.

*     *     *

Q.    Do you take any steps after you've hired somebody, starting on day 1 of their employment, to make sure that they're not violating any agreement with their former employer?

A.    I don't know of any agreement, so how could I take steps to prevent them from violating it?

5.    Beacon Hill is a serial tortfeasor that grows by violating restrictive covenants. In fact, Wang views violating restrictive covenant agreements as a critical part of its growth strategy.

6.    Between 2003 and 2009, Beacon Hill grew from approximately 40 employees to 100. But, starting in approximately 2010, Beacon Hill began experiencing stratospheric employee growth, as is evident from their employee figures in the "our evolution" page of Beacon Hill's website:



This led off a period where Beacon Hill became a "double digit consecutive-time nominee to both the Boston Business Journal's Fastest-Growing Private Companies list and Inc. Magazine's Fastest-Growing Private Companies list." *See Our Evolution*, available at: https://beaconhillstaffing.com/About/Our-Evolution (last accessed August 7, 2020).

7.     This massive growth also coincided with an exponential increase in the number of restrictive covenant lawsuits filed against Beacon Hill. Prior to 2010, Beacon Hill was named as a defendant in only one restrictive covenants lawsuit.[1] However, after 2010, Beacon Hill has been sued *no fewer than 20 times* for tortious interference with contractual obligations.

8.     Beacon Hill's volume of restrictive covenant litigation is dramatically disproportionate to Beacon Hill's size. The reason why Beacon Hill is sued for restrictive covenant violations at a dramatically higher rate than its competitors is because Beacon Hill

---

[1] This number is based on a PACER search, which would not capture state court litigation filed against Beacon Hill.

grows by hiring employees and placing them in positions that violate restrictive covenant agreements.

9.      This strategy is conceived of, driven, and implemented by Wang, assisted by other members of its Executive Committee, including Charlie Cain. According to Wang's professional biography on Beacon Hill's website, he has spearheaded Beacon Hill's transformation from a small, 10-person company to a company employing more than 600 employees. Beacon Hill describes Wang as "responsible for Beacon Hill Staffing Group's vision, strategic direction, and overall performance." Wang is the quintessential micromanager and is personally responsible not only for conceiving of Beacon Hill's illegal growth strategy, but personally executing on it and personally committing torts.

10.      Indeed, Wang personally authors every single offer letter to every new Beacon Hill hire. This is not the behavior of a CEO who is merely responsible for high-level strategic decisions and delegates the execution thereof to lower level executives; Beacon Hill *is* Andy Wang and he would have it no other way.

11.      Numerous companies, including Randstad, have sent Wang letters informing him and Beacon Hill of restrictive covenant agreements these companies have entered into with recent Beacon Hill new hires and have requested that Beacon Hill ensure that they cease and desist interfering with the restrictive covenant agreements. The response is typically a form letter from outside corporate counsel that does not deny any facts—how could it?—but rather feigns indignation, plays the victim, and lashes out at Randstad for coming after the "little guy"; all classic examples of projection.

12.      Wang is also aware of his company's propensity to hire individuals subject to restrictive covenant agreements, because Beacon Hill offer letters—which, again, he personally

authors and often signs—regularly contain an agreement to pay for legal fees associated with any lawsuit brought by the prior employer. They do not, however, include language that is standard in offer letters in the staffing industry (among many others) seeking assurances that the employee is permitted to work in the role for which he or she is being hired and is not limited in any manner by a restrictive covenant; as Mr. Cain testified under oath as Beacon Hill's 30(B)(6) witness, Beacon Hill does not want to know that information.

13.    Not surprisingly, Wang is aware of Beacon Hill's involvement in restrictive covenants litigation as a Defendant. However, Wang has made a conscious decision to repeatedly violate restrictive covenant in order to obtain premium talent by engaging in behavior that other participants in the market will not: blatantly violating restrictive covenants.

14.    On information and belief, Wang actively directs Beacon Hill's managing directors to hire experienced individuals in markets where Beacon Hill wishes to develop a new line of business without regard to whether that individual is bound by any restrictive covenant, because he assesses that it is less expensive to do so than to nurture homegrown talent, even including the cost of any resulting litigation if he gets caught (and, as discussed herein, Beacon Hill takes steps to insure its conduct is hidden).

15.    Beacon Hill also communicates its willingness to violate restrictive covenants to potential hires and, on information and belief, to third-party recruiters it retains. For instance, in the summer of 2019, a Randstad employee interviewed with Charlie Cain, head of Beacon Hill's administrative division and a member of its Executive Committee. When the employee expressed concern about his non-compete with Randstad, Cain told the employee to not worry about his non-compete, that Beacon Hill had a very good legal team, and that he should focus on producing and Beacon Hill would handle any issues related to his non-compete.

16.     In spite of that knowledge, Beacon Hill has not implemented a policy or practice to screen potential new hires for restrictive covenant agreements. Nor does it take any action to ensure non-interference with their competitors' agreements after receiving cease and desist letters from their competitors or otherwise learning of an employee's restrictive covenant agreement. Rather, in an effort to grow its business as quickly as possible, Beacon Hill intentionally ignores or intentionally attempts to avoid learning about restrictive covenant agreements that potential new hires may have with their prior employers; and when it does learn of such agreements it ignores them. But this "head in the sand" approach does not eliminate Beacon Hill's legal obligation not to interfere with its competitor's restrictive covenant agreements and compete unfairly, in particular when it already knows exactly what it is trying to avoid gaining knowledge of.

17.     Many of the employees Beacon Hill has targeted and raided now fill leadership positions at Beacon Hill. For example, six out of eight members of the self-described "leadership" team for BH Solutions, Beacon Hill's managed services business, are recent former Randstad employees. Indeed, BH Solutions did not even exist until Beacon Hill raided the leadership and copied Randstad's business model for its managed services business, Randstad Corporate Services ("RCS"), in 2017. This flagrant breach of Randstad's restrictive covenant agreements[2] resulting in Randstad's filing two lawsuits against Beacon Hill.

18.     When hiring more senior employees, Beacon Hill accounts for the likelihood of potential restrictive covenant litigation by including in some offer letters an offer to pay for the employee's legal counsel—which is usually its own outside counsel—to defend against any

---

[2] The Employee Non-Competition and Confidentiality Agreement applicable to each employee is identified by the employee's last name followed by the word "Agreement." Those agreements are expressly incorporated herein.

claims brought by a prior employer. For instance, Beacon Hill hired Bestreich, a former Vice President at Randstad and now part of Beacon Hill's leadership team in Dallas, Texas. In her offer letter, Beacon Hill identified Randstad by name and included a promise to pay for her legal counsel in the event that Randstad sued her for accepting employment with and working for Beacon Hill.

19.     Despite recognizing that Randstad would have a valid basis to initiate litigation against Beacon Hill and Bestreich, Beacon Hill did nothing to prevent her from violating her restrictive covenant agreement—even after it received a cease and desist letter from Randstad.

20.     Through its strategy to interfere with restrictive covenants and obfuscate its hiring of individuals in positions that violate their restrictive covenants, Beacon Hill illegally capitalizes on goodwill and market share developed by Randstad and other competitors, gambling that a competitor will not initiate a lawsuit if several weeks or months pass before the employee is identified as working at a competitor.

21.     By hiring employees in positions that violate their restrictive covenants, Beacon Hill is able to establish viable offices in locations where it previously failed. For instance, Beacon Hill attempted to establish a presence in Dallas in administrative staffing in 2011 and 2012, but the location did not become self-sufficient and collapsed. It was not until Beacon Hill hired Bestreich in 2018, and encouraged her as an agent of Beacon Hill to recruit and hire others from Randstad, that Beacon Hill was finally able to gain a foothold in Dallas. Beacon Hill interferes with and blatantly ignores restrictive covenants in an effort to avoid the inherent difficulties and costs in organically developing new business. It is easier to steal something than to build it, as Beacon Hill has shown time and again.

22.     Just a few weeks after Randstad sent Bestreich and Wang, Beacon Hill's CEO, a cease and desist letter that included of Bestreich's restrictive covenant agreement (the "Bestreich Agreement"), Bestreich recruited Erik Adams, a former Randstad staffing manager and indirect report. Even after receiving this cease and desist letter *and* after Randstad filed the Georgia Litigation, Beacon Hill and Bestreich tortiously interfered with another Randstad employees' agreement by soliciting Shauna Mooney, another former Randstad Branch Manager, to join her at Beacon Hill.

23.     As Beacon Hill is well aware, Bestreich, Adams, and Mooney are/were contractually prohibited from working for a competitor such as Beacon Hill within the Restricted Territory, as that term is defined in their agreements, for 12 months after leaving Randstad, and from doing business with Randstad's customers and hiring its employees for 18 months. Yet they violated their contractual and legal obligations with the aid of Beacon Hill, as have other former Randstad employees now working for Beacon Hill.

24.     In an attempt to quell Beacon Hill's assault and limit the harm to its business, Randstad has sent letters to the employees and to Beacon Hill reminding them of the employees' contractual and legal obligations and demanding compliance therewith, and even filed two lawsuits based on Beacon Hill's attempt to pilfer RCS's leadership team.

25.     But Beacon Hill remains undeterred in their raid of Randstad's employees and, indeed, Beacon Hill has become even more brash. After Randstad initiated the Georgia Litigation, Beacon Hill continued to hire employees from Randstad knowing full well that it hired them for positions that violated their restrictive covenant agreements with Randstad, and even allowed (if not encouraged) Bestreich to solicit and hire Randstad employees, including by

9

introducing Mooney to Beacon Hill the day after receiving notice of this lawsuit and inducing Beacon Hill to hire Mooney in violation of her restrictive covenant agreement.

26.     Beacon Hill has directly contacted more than 100 Randstad employees this year, the vast majority of which would be performing the same job in the same market.

27.     Beacon Hill's improper and illegal interference with Randstad's agreements is not limited to a single rogue business manager or division. Nor is it limited to the hiring of Bestreich, Adams, and Mooney. Rather, this flagrant disregard for restrictive covenants is built into how it does business; it forms the basis for Beacon Hill's growth strategy.

28.     Beacon Hill hired at least nine Randstad employees in positions that violate their agreements with Randstad *during the Georgia Litigation alone* and actively hid that information from Randstad.

29.     Beacon Hill also instructs its new hires from Randstad not to tell Randstad they are going to work for Beacon Hill and to actively take measures to minimize the disclosure of this fact.

30.     Beacon Hill's hires from Randstad routinely change their LinkedIn profiles to indicate that they are no longer employed by Randstad but do not update their LinkedIn profile to show that they are employed by Beacon Hill. This behavior is utterly illogical for recruiters, who heavily rely on LinkedIn for work; but it is perfectly logical when viewed in the context of Beacon Hill's longer term growth strategy.

31.     In at least one instance, a new Beacon Hill employee changed her employment history to show that she was now employed at an "undisclosed" employer rather than publicly identify herself as an employee of Beacon Hill.

Experience

National Strategic Accounts
Undisclosed · Full-time
Jul 2020 – Present · 2 mos

Sr. Manager, Business Development
Randstad Technologies US
Aug 2017 – Jul 2020 · 3 yrs
Greater Denver Area

32.    This duplicitousness continued in the Georgia Litigation. For example, as far back as November 2019, Randstad asked Beacon Hill whether it hired Mark Cerretani, a former Randstad Technologies employee. Beacon Hill refused to confirm that it hired Cerretani. Furthermore, Cerretani, like other employees hired by Beacon Hill, refused to inform Randstad where he was going to work. Even though Cerretani resigned in November 2019, he still lists Randstad as his employer on his LinkedIn account. Despite multiple promises from Beacon Hill's counsel to inquire whether Beacon Hill hired Cerretani, Beacon Hill ignored Randstad's request. When Randstad finally confirmed that Cerretani had gone to work at Beacon Hill, it sent cease and desist letters to Beacon Hill. Beacon Hill, however, refused to identify Cerretani's new title and simply responded that Cerretani was not working in a competitive role. Beacon Hill refused to provide any more information despite multiple follow-up requests from Randstad's counsel. Delay and obfuscation of this nature is Beacon Hill's *modus operandi*.

33.    Beacon Hill's misconduct continues to occur even as Randstad prepared this Complaint. In July 2020, Randstad learned that Ashley Hooper, a former Delivery Manager for Randstad, had accepted a position with Beacon Hill as an Account Executive. On information and belief, Hooper's position at Beacon Hill is substantially similar to her position at Randstad.

11

34.     And Beacon Hill's improper and illegal conduct is not limited to hires in violation of non-competition clauses. Beacon Hill also takes no measures to prevent its new hires from violating non-solicitation provisions in restrictive covenant agreements and actively encourages new hires to violate the non-solicit provisions.

35.     Beacon Hill's conduct is improper, unfair, and illegal. It must stop. Bestreich, Adams, Mooney, Hooper, and numerous other employees are employed or have been employed in positions with Beacon Hill that violate their restrictive covenants. Beacon Hill is complicit with those breaches, among many others, and acknowledges that it does absolutely nothing to prevent violations of restrictive covenants; in fact, it admittedly does not even want to know about them. Unfortunately, because litigation of this sort is seen as just another cost of doing business, or an investment by Beacon Hill—worth it if the cost of such is less than the benefit of the misappropriated information and customer goodwill—the only way to ensure that Beacon Hill ceases its illegal conduct is for the Court to enter broad injunctive relief and to award Randstad substantial damages. A message must be sent to Beacon Hill that its conduct is unfair and inappropriate.

36.     This case is about Beacon Hill's hiring practices generally. It is not limited to any particular employee, division, office, or hire, no matter how hard Beacon Hill tries to frame it in that manner (and it will). Bestreich, Adams, and Mooney are mere symptoms of Beacon Hill's malfeasance, they are not the cause. Nor will holding Beacon Hill accountable solely for those three hires root out the underlying cause, which is Beacon Hill's utter disregard for Randstad's enforceable restrictive covenant agreements with its employees. As the Court noted in the Georgia Litigation: "To be sure, the Court is alarmed by Beacon Hill's apparent disregard for the fact that Randstad employees are generally bound by a covenant not to compete." However, the

12

Court found that Beacon Hill was not subject to personal jurisdiction in Georgia. There is no jurisdictional issue here and, respectfully, this Court should be equally alarmed and should put a stop to it once and for all.

37.     The Court should also enter exemplary and punitive damages awards against Beacon Hill for this wanton and intentional misconduct.

## PARTIES, JURISDICTION, AND VENUE

38.     Plaintiff Randstad General Partner (US), LLC is a Delaware limited liability company with a corporate office and principal place of business located at One Overton Park, 3625 Cumberland Blvd S.E., Atlanta, GA 30339.

39.     Plaintiff Randstad Technologies, LLC is a Delaware limited liability company with a corporate office and principal place of business located at One Overton Park, 3625 Cumberland Blvd S.E., Atlanta, GA 30339.

40.     Defendant Beacon Hill is a Massachusetts limited liability company with a principal place of business located at 152 Bowdoin Street, Boston, Massachusetts 02108. Beacon Hill maintains an office in Dallas, Texas and regularly transacts business in the State of Texas.

41.     Beacon Hill is subject to the jurisdiction of this Court because it engaged in tortious conduct in Dallas County, Texas. As described in detail in this Complaint, Beacon Hill, as part of its pattern or practice of ignoring and/or failing to inquire regarding its candidates restrictive covenants, hired and employed Bestreich, Adams, Mooney, Hooper, and others in positions that violated their restrictive covenants. Beacon Hill is also subject to personal jurisdiction in Texas because it did not challenge personal jurisdiction in its first motion under Rule 12. *See* Fed. R. Civ. P. 12(g)(2), 12(h)(1).

42.     Defendant Bestreich is an individual who, upon information and belief, resides at 7137 Royal Lane, Dallas, Texas 75230. Until her resignation on June 14, 2018, Bestreich served as Vice President, Market Sales, for Randstad. Bestreich is subject to the jurisdiction of this Court because she is a resident and citizen of Texas.

43.     Defendant Wang is an individual who resides at 315 Marlborough Street, Boston, Massachusetts 02116. Wang is the current CEO of Beacon Hill and has a pivotal role in Beacon Hill's operations and strategy. Wang also personally prepares the offer letter for each Beacon Hill employee.

44.     Wang is subject to personal jurisdiction in Texas because he engaged in intentional conduct specifically aimed at Texas, primarily by preparing offers of employment and authorizing Beacon Hill to hire employees in positions that he knew violated their restrictive covenant agreements. In doing so, Wang committed multiple tortious acts directed at Texas, in furtherance of his strategy to grow Beacon Hill by hiring employees without regard to whether the employee had a restrictive covenant agreement with his or her prior employer.

45.     Wang has actively encouraged and developed a program or policy of interfering with or violating restrictive covenant agreements, either directly or by directing individuals who report to hire individuals without regard to whether they are subject to restrictive covenant agreements. Wang is centrally responsible for fostering a culture at Beacon Hill that flouts restrictive covenant agreements, as evidenced by Beacon Hill's extensive litigation record, Wang's constant receipt of cease and desist letters, and his continued involvement in hiring Randstad personnel even after the commencement of the Georgia Litigation.

46.     Does 1-10 are additional Beacon Hill management personnel involved in assisting Wang execute his scheme to gain premium talent and growth. Upon information and belief, Does

1-10, the name and number of which are unknown, have directly and knowingly assisted Wang in hiring Randstad personnel in complete disregard of Randstad's restrictive covenant agreements.

47.     Subject matter jurisdiction exists because diversity of citizenship jurisdiction is present under 28 U.S.C. § 1332(a).

48.     Randstad General Partner (US), LLC is a limited liability company, and its members are citizens of Delaware and Georgia. Thus, Randstad General Partner (US), LLC is a citizen of Delaware and Georgia. Randstad Technologies, LLC is a limited liability company, and its members are citizens of Delaware and Georgia. Thus, Randstad Technologies, LLC is a citizen of Delaware and Georgia.

49.     Beacon Hill is a limited liability company, and its members are ultimately citizens of Massachusetts and Florida. Beacon Hill is not a citizen of Delaware or Georgia.

50.     Wang is a resident and citizen of Massachusetts.

51.     Bestreich is a resident and citizen of Texas.

52.     Does 1-10 are fictitious entities and their citizenship is disregarded for purposes of evaluating diversity of citizenship.

53.     Thus, complete diversity is present because Plaintiffs are citizens of Delaware and Georgia, and Defendants are citizens of Massachusetts, Florida, and Texas.

54.     The amount in controversy requirement is also satisfied. Randstad seeks compensatory damages, lost profits, and exemplary damages in excess of $5 million. Randstad also seeks to recover its reasonable attorneys' fees incurred in this action, as well as injunctive relief.

55.     Venue is appropriate in Dallas County, Texas, because Defendants removed this case to this Court from the county embracing this district. 28 U.S.C. § 1441(a).

## FACTUAL BACKGROUND

### I.     RANDSTAD'S CONFIDENTIAL INFORMATION AND LEGITIMATE BUSINESS INTERESTS

56.     Randstad is a leader in the staffing solutions industry. Randstad and its affiliates and subsidiaries provide individual employees ("Talent") to a diverse portfolio of businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs. Randstad's General Staffing Division ("RGS"), which Bestreich, Adams, and Mooney, worked for, specializes in placing temporary employees in office, clerical, and light industrial positions in a variety of industries. Randstad's Technologies Division ("RT"), which Hooper (with Betreich, Adams, and Mooney, the "Beacon Hill Hires") worked for, specializes in placing temporary employees in information technology roles.

57.     The staffing industry is a highly competitive, specialized business that is relationship-driven between customers, Talent, and the sales force. Through decades of hard work, dedication, innovation and investment, Randstad has become a leader in the staffing industry, including in the general staffing and information technology spaces.

58.     Randstad invests heavily in developing and maintaining Customer relationships and in attracting and retaining top employees and Talent for both its internal operations and for assignments with its Customers.

59.     Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent.

60.     To meet its Customers' expectations and needs, Randstad has developed and maintained, at great expense, valuable and long-standing working relationships and substantial goodwill with its Customers.

61.     Randstad has reasonably come to expect that its long-standing Customer relationships will continue into the future.

62.     Randstad's employees, including the Beacon Hill Hires, receive substantial training, information, business contacts, and other advantages that provide Randstad with a competitive advantage in the marketplace.

63.     The Beacon Hill Hires, through their employment with Randstad, gained unique knowledge of and had access to Randstad's trade secrets and other confidential and proprietary information, including, without limitation, information relating to Randstad's business strategies, finances, methodologies, processes, operations, pricing, Customers, Talent and employees ("Confidential Information").

64.     The Confidential Information to which the Beacon Hill Hires and other former Randstad employees now working for Beacon Hill had access during their employment with Randstad is critical to Randstad's competitive position in the staffing industry.

65.     Randstad developed such Confidential Information at significant expense and effort over a number of years, such information is not generally available to the public or Randstad's competitors, and Randstad derives economic value from this information.

66.     Randstad also takes reasonable efforts to maintain the confidentiality of such information, including having its employees with access to such information sign confidentiality agreements and using password protected computers and password protected log-ins to Randstad's databases.

67.     Randstad also requires many of its employees to execute employment agreements containing restrictive covenants to protect its confidential information.

68.     Additionally, Randstad employees, including the Beacon Hill Hires and other former Randstad employees now working for Beacon Hill, are bound by the Randstad Internal Employee Handbook (the "Employee Handbook"), which provides in part at Section 13:

> All property, equipment, and materials supplied to you by Randstad or its client ("Property") are deemed to be the Property of Randstad or its client and not your personal property. This Property includes, but is not limited to, Resources (defined Subsection 14.1), badges, corporate credit cards, access cards, keys, office supplies, office equipment, and office furniture. Property also includes documents, data, certain inventions, certain copyrightable works of authorship, confidential information, and trade secrets.
>
> *          *          *
>
> Associates may not misuse or make unauthorized disclosures of non-public, confidential information (including trade secrets) that is acquired during the course of employment with Randstad. The confidential information of Randstad and its clients should be held in trust and confidence, not disclosed to any third party, and only used for the advancement of Randstad and/or client's interests, either during employment or following termination of employment for any reason. Examples of confidential information include, but are not limited to, non-public, proprietary details about Randstad and/or its client's strategies, operational plans, pricing, financial information and forecasts, personnel information, payroll information, personally identifiable information, protected health information and trade secrets. No copies, abstracts or summaries of such materials may be made except for use in performing duties for Randstad or its client. Any such materials must be returned to Randstad prior to leaving Randstad. If any non-public information is requested by anyone outside of Randstad, the appropriate managing director and/or Legal should be notified. Until an Associate obtains proper guidance, the requested information should not be disclosed.

69.     Section 13.5 of the Employee Handbook provides in part:

> Upon request by Randstad or its client, at any time, and in any event upon termination of the Associate's employment with Randstad for any reason, Associates shall promptly deliver to Randstad all Property, defined above, within their possession or control. If any Property belonging to the Customer or Randstad is not returned, you will be subject to any and all remedies available

under applicable law for the recovery of such Property. At a minimum, you will be responsible for the replacement value of such Property.

70.     Additionally, Randstad informs employees that Randstad's computer networks and resources are "critical business assets and are the Property of Randstad and/or its customer." The Handbook further provides that that:

> Users are responsible for taking appropriate security measures when transmitting or storing sensitive or confidential information. Because electronic transmissions, including Internet transmissions, e-mail and instant messages, may be accessible by outside individuals, sensitive or confidential information should never be transmitted electronically unless it is encrypted or otherwise protected in accordance with Randstad's U.S. Data Protection Policy, available on the Legal pages of Randstad Connect and Workplace. Sensitive and/or confidential business information and documents should not be displayed on terminals when anyone other than an authorized User is present. Confidential and/or sensitive documents should not be stored in a database or on a system where unauthorized persons can access them.

71.     With respect to protection of passwords, the Handbook instructs employees to be responsible for securing passwords and identification codes, as well as periodically change them to prevent unauthorized access to Randstad systems.

72.     Randstad undertakes these extensive measures to protect its Confidential Information because, if Randstad's Confidential Information were to fall into the hands of a competitor, such as Beacon Hill, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. Likewise, if a former employee, such as the Beacon Hill Hires, retained Randstad's Confidential Information after their employment ended and/or used the Confidential Information while working for a competitor, Randstad's competitive position would be seriously harmed and both the Beacon Hill Hires and Beacon Hill would have an unfair competitive advantage.

73.     Beacon Hill considers similar information, including its business strategies, customer lists, and customer information, to be confidential and proprietary and employs measures, such as the use of restrictive covenant agreements, to protect its information.

## II.    BEACON HILL AND RANDSTAD ARE COMPETITORS

74.     Randstad and Beacon Hill are direct competitors across the United States. Both companies provide staffing services to  their clients. While the companies have a different operating structure, their services substantially overlap in all material respects.

75.     For example, Randstad General Staffing is a Randstad operating company that focuses on placing Talent in office and administrative positions (also called "O&A"), as well in accounting, customer service, human resources, and other similar positions in direct hire, temporary staffing, and temporary-to-permanent roles. Beacon Hill has a similar division that is referred to as Beacon Hill Associates, and this entity focuses on the same general job classifications.

76.     Similarly, Randstad Technologies is a Randstad operating company that focuses on technology placements and consulting services, including software engineers, network administrators, systems analysts, and other positions in the information technology space. Beacon Hill Technologies, a division of Beacon Hill, focuses on the same placement and consulting services.

77.     Randstad and Beacon Hill frequently compete against each other for the same portfolios of work, as is evident when comparing job placement listings on their respective websites. Randstad and Beacon Hill post open positions for temporary, temp-to-perm, and permanent placements on their respective websites, and the companies greatly overlap in the types, forms, and categories of staffing services they provide to their clients.

78.     Because the basic function of staffing companies—the provision of staffing services—is consistent across service providers, staffing companies must distinguish themselves on the caliber of their personnel, their ability to efficiently provide staffing services, and the quality of the Talent that the staffing companies are able to provide.

79.     As detailed below, rather than organically develop its own employees, Beacon Hill relies on its competitors, like Randstad, to develop and invest in personnel and establish customer relationships and then hires those employees, placing the employees in the same market, performing the same services, and often soliciting the same customers.

## III.    BEACON HILL'S PATTERN OF RAIDING COMPETITORS AND FLAGRANTLY VIOLATING RESTRICTIVE COVENANT AGREEMENTS

80.     Since its inception, Beacon Hill has pursued a strategy of growing by poaching employees from competitors, without regard to whether the employee is subject to any restrictive covenant agreements. Indeed, Beacon Hill's website boasts that, under Wang's leadership, Beacon Hill has grown from fewer than 10 to more than 600 employees. It omits, however, that a large portion of that growth has occurred because of Beacon Hill's illegal poaching of its competitors' employees to "acqui-hire" customer relationships, in violation of restrictive covenant agreements.

81.     As a result, Beacon Hill is constantly defending itself against tortious interference claims based on alleged violations of restrictive covenant agreements. Beacon Hill has been a defendant in more than 20 trade secret or restrictive covenants lawsuits since 2011, including the following:

(a)     *TEKsystems, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 3:11-cv-00767-bbc (W.D. Wis.): Beacon Hill sued for misappropriation of trade secrets and tortious interference with a restrictive covenant agreement.

(b) *Update, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 1:12-cv-05295-PAC (S.D.N.Y.): Beacon Hill sued for misappropriation of trade secrets and tortious interference with restrictive covenant agreements.

(c) *Internal Data Resources, Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. 1:14-cv-01860-RWS (N.D. Ga.): Beacon Hill sued for tortious interference with a restrictive covenant agreement.

(d) *TEKsystems, Inc. v. Beacon Hill Staffing Group, LLC,* et al., No. 0:14-cv-00196-JRT-JJK (D. Minn.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(e) *Randstad General Partner (US) LLC v. Beacon Hill Staffing Group, LLC*, et al.,: Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

   ❖   Randstad sought and obtained a TRO against Beacon Hill.

(f) *Convergenz LLC v. Beacon Hill Staffing Group LLC*, No. 1:14-cv-01864-ABJ (D.D.C.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(g) *Kforce Inc. v. Beacon Hill Staffing Group LLC,* et al., No. 4:14-cv-01880-CDP (E.D. Mo.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(h) *APFS LLC v. Beacon Hill Staffing Group, LLC* et al., No. 2015-CH-3301 (Cook Cty. Cir. Ct. 2015): Beacon Hill sued for tortious interference with a restrictive covenant agreement by encouraging a new hire to solicit clients, in violation of the employee's restrictive covenant agreement.

(i) *Insight Global LLC v. Beacon Hill Staffing Group, LLC*, et al., No. 15SL-CC02718 (St. Louis Cty. Cir. Ct. Mo.): Beacon Hill sued for tortiously interfering with a restrictive covenant agreement.

(j) *Solomon Edwards Group LLC v. Beacon Hill Staffing Group, LLC* et al., No. 2015-21048 (Montgomery Cty., Pa.): Beacon Hill sued for tortiously interfering with a restrictive covenant agreement.

(k) *Computer Enterprises Inc. v. Beacon Hill Staffing Group, LLC*, et al., No. GD-15-13967 (Allegheny Ct. Common Pleas, Pa.): Beacon Hill sued for tortiously interfering with restrictive covenant agreement.

(l) *Diversant, LLC v. Beacon Hill Staffing Group LLC*, No. 3:15-cv-00172-RJC-DSC (W.D.N.C.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(m)  *Robert Half International, Inc. v. Beacon Hill Staffing Group, LLC* et al., No. 15-2-15320-0 (King Cty. Super. Ct., Wa.): Beacon Hill sued for tortious interference with restrictive covenants and misappropriation of trade secrets.

(n)  *Modis, Inc. v. Diet*, No. 4:15-cv-00110-SMR-RAW (S.D. Iowa): Modis subsequently amended its complaint to add Beacon Hill as a defendant and asserted claims against Beacon Hill for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(o)  *Insight Global, LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 5:17-cv-00309-BLF (N.D. Cal.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(p)  *Randstad General Partner (US) LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 1:17-cv-00680-ELH (D. Md.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(q)  *Randstad General Partner (US) LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 1:17-cv-10404-ADB (D. Mass.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(r)  *Insight Global, LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 1:17-cv-01915-MSK-MJW (D. Colo.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

    ❖  Insight Global alleged that Beacon Hill "has conducted and continues to conduct an unlawful employee-raiding campaign of Insight Global's then-current and former employees."

    ❖  Insight Global also alleged that, in the month preceding the complaint, Beacon Hill had hired no fewer than five Insight Global employees and accused BSHG of concealing its hires from Insight Global.

(s)  *Insight Global, LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 4:17-cv-02440 (S.D. Tex.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(t)  *Aerotek, Inc. v. Beacon Hill Staffing Group, LLC,* et al., No. 4:17-cv-02469-HEA (E.D. Mo.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(u)  *Robert Half International, Inc. v. Beacon Hill Staffing Group, LLC,* et al., No. 1:18-cv-01001-APM (D.D.C.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

(v)  *Insight Global, LLC v. Beacon Hill Staffing Group, LLC,* et al., No. 1:17-cv-08323-PGG (S.D.N.Y.): Beacon Hill sued for tortious interference with a restrictive covenant agreement and for misappropriation of trade secrets.

&#10022;   Insight Global reiterated its claim in previous litigation that "[c]ompeting unfairly for employees — including by inducing employees to breach their contracts with competitors — is Beacon Hill's business model."

&#10022;   Insight Global noted that "Beacon Hill has been sued almost thirty times over the last eleven years in similar cases by nmany competitors in the staffing industry."

&#10022;   Insight Global also claimed that "it is Beacon Hill's *modus operandi* to conceal its hires of former Insight Global employees from Insight Global (by, for example, instructing the employees to not update their LinkedIn profiles to disclose their employment with Beacon Hill)."

(w)    *Peopleshare LLC v. Beacon Hill Staffing Group Inc.* [sic], No. 2019-15863 (Montgomery Cty., PA): Beacon Hill sued for breach of contract. The Court entered a preliminary injunction against Beacon Hill.

(x)    *Randstad General Partner (US), LLC v. Beacon Hill Staffing Group, LLC*, et al., No. 1:19-cv-1655-ODE (N.D. Ga.): Beacon Hill sued for tortious interference with restrictive covenant agreements.

82.    These lawsuits, and any negotiated resolutions thereof, are relevant not only because they illustrate that hiring from competitors without regard for those competitors' restrictive covenant agreements with their employees is Beacon Hill's *modus operandi*, and that it considers litigation just another cost of doing business, but also because Beacon Hill's acceptance and implementation of limited no-hire agreements demonstrates that creating and implementing effective restrictive covenant screening procedures is feasible. Such litigation and settlements also establishes that Beacon Hill rescinds any screening measures unless they are contractually obligated to maintain them, demonstrating their willful disregard for restrictive covenants and bad faith.

83.    Beacon Hill's practice, implemented by Wang and its leadership team, is quite uniform. The company will ignore a competitor's restrictive covenant agreement, solicit the employee, hire the employee into an area they are restricted from working in, in a role they are prohibited from performing, and promise to defend the employee against any legal action

brought by the former employer, which Beacon Hill views as a cost of doing business. After the suit is filed, Beacon Hill will then almost always file a motion to dismiss in an attempt to avoid discovery, then attempt to resolve the litigation for a short mutual no-hire period or something of that nature.

84.     Beacon Hill will then enter into a confidential settlement agreement to resolve the matter, then continue the same course of conduct that leads them to inevitably violate later restrictive covenant agreements. By operating in this manner, their behavior is akin to a company that tolerates widespread sexual harassment by paying off harassed employees rather than take any steps to comply with the law.

85.     Despite this immense amount of litigation, according to its corporate representative's deposition, Beacon Hill has never had internal discussions about hiring employees from competitors that employ restrictive covenants.

86.     Randstad is a frequent target for Beacon Hill. Beacon Hill has hired over 40 Randstad employees since 2005.

87.     According to LinkedIn, there are 72 employees who currently work at Beacon Hill who previously worked for Randstad.[3]

88.     Beacon Hill incessantly targets Randstad employees and attempts to solicit them to leave Randstad and join Beacon Hill in roles that violates an applicable restrictive covenant agreement. In fact, since July 1, 2020, Beacon Hill and/or recruiters working on Beacon Hill's behalf of solicited over 100 Randstad employees for jobs at Beacon Hill.

---

[3] This search was performed by searching for individuals who list their current company as Beacon Hill Staffing Group and who list Randstad, Randstad USA, or Randstad Technologies as a previous employer.

89.     Beacon Hill does not ask candidates whether they are subject to restrictive covenant agreements when considering them for employment.

90.     Beacon Hill's administrative division (also known as Beacon Hill Associates) does not ask candidates whether they are subject to restrictive covenant agreements when considering them for employment.

91.     Beacon Hill's information technology staffing division (also known as Beacon Hill Technologies) does not ask candidates whether they are subject to restrictive covenant agreements when considering them for employment.

92.     Beacon Hill's other divisions do not ask candidates whether they are subject to restrictive covenant agreements when considering them for employment.

93.     Beacon Hill's divisions do not take measures to ensure that newly hired employees comply with non-solicitation obligations.

94.     Beacon Hill is aware that Randstad uses restrictive covenant agreements. Randstad has sent multiple cease and desist letters to Beacon Hill and initiated litigation against Beacon Hill. Even after Wang received numerous cease and desist letters from Randstad, he continues to authorize and implement Beacon Hill's strategy to grow by violating restrictive covenants—a strategy that other competitors do not emulate because they do not wish to routinely violate the law. As a result, Beacon Hill and Wang nonetheless continue to hire Randstad employees without making any efforts to determine whether that individual would be placed in a role that violates Randstad's restrictive covenants.

95.     Since 2016 alone, Beacon Hill has hired dozens of Randstad employees, including at least 10 who Beacon Hill hired for leadership positions. Some of its significant hires include the following.

26

(a)     On or about April 2016, Beacon Hill hired Lindsey Paskvan, the Sales Director, National Strategic Organization for Randstad Technologies.

(b)     On or about August 2016, Beacon Hill hired Ashlie Moseley, an Account Executive for Randstad North America.

(c)     On or about December 2016, Beacon Hill hired John Williams, a Senior Regional Vice President for Randstad Corporate Services.

(d)     On or about December 2016, Beacon Hill hired Kathleen Keliher, a Senior Vice President for Randstad Corporate Services.

(e)     On or about March 2017, Beacon Hill hired Mark Todd, the Director of Business Development - Integrated Talent Solutions for Randstad Sourceright.

(f)     On or about March 2017, Beacon Hill hired Christina Ethridge, the Team Lead for Randstad Corporate Services.

(g)     On or about May 2017, Beacon Hill hired Karen Rigano, a Senior Account Executive for Randstad Technologies.

(h)     On or about July 2017, Beacon Hill hired Shakira Irizarry, the Managing Director - Preferred Clients for Randstad Life Sciences.

(i)     On or about October 2017, Beacon Hill hired John D'Agostino, a Strategic Account Director for Randstad Technologies.

(j)     On or about November 2017, Beacon Hill hired Reed Goodman, the Director of Business Development for Randstad Sourceright.

(k)     On or about January 2018, Beacon Hill hired Bailey Ulrich, an Account Manager for Randstad Technologies.

(l)     On or about June 2018, Beacon Hill hired Shawna Bestreich, the Vice President, Market Sales for Randstad General Staffing.

(m)     On or about July 2018, Beacon Hill hired Theo Carmone, a Technical Recruiter for Randstad Technologies.

(n)     On or about August 2018, Beacon Hill hired Matthew O'Neil, a Technical Recruiter for Randstad Technologies.

(o)     On or about September 2018, Beacon Hill hired Erik Adams, a Staffing Manager for Randstad General Staffing.

(p)     On or about October 2018, Beacon Hill hired Todal Patel, a Practice Director for Randstad North America.

(q)     On or about January 2019, Beacon Hill hired Joseph Lucchese, a Technical Recruiter at Randstad Technologies.

(r)     On or about February 8, 2019, Beacon Hill hired Edward Darisse, a Program Manager for RCS.

(s)     On or about March 2019, Randstad hired Brittany Jeffries, a Technical Recruiter for Randstad Technologies.

(t)     On or about April 2019, Randstad hired Meghan Ledden, a Technical Recruiter for Randstad Technologies.

(u)     On or about June 11, 2019, Beacon Hill hired Shauna Mooney, a Branch Manager for Randstad General Staffing.

(v)     On or about November 2019, Beacon Hill hired Mark Cerretani, the Area Recruiting & Immigration Director for Randstad Technologies.

(w)     On or about November 2019, Beacon Hill hired Mitchel Gaffney, a Technical Recruiter for Randstad Technologies.

(x)     On or about January 2020, Beacon Hill hired Kevin D'Entremont, a Recruiting Director for Randstad Technologies.

(y)     In or around March 2020, Beacon Hill hired Caitlin Murdoch, a Recruiting Director for Randstad Technologies.

(z)     In or around March 2020, Beacon Hill hired Abbey Rose, a Staffing Manager for Randstad General Staffing.

(aa)    In or around March 2020, Beacon Hill hired Victoria Ragan, a Strategic Account Manager for Randstad Technologies.

(bb)    In or around April 2020, Beacon Hill hired Ashley Hooper, a Delivery Manager with Randstad Technologies.

(cc)    In or around May 2020, Beacon Hill hired Lou Weidman, an Account Executive for Randstad Technologies.

(dd)    In or around June 2020, Beacon Hill hired Jamie Ferguson, the Director of Training - Sales for Randstad.

(ee)    In August 2020, Beacon Hill hired Daniel Blazek, a Technical Recruiting Director for Randstad Technologies.

(ff)    In or around September 2020, Beacon Hill hired Sam Major, a Technical Lead: Client Engagement and Consulting for Randstad Technologies.

(gg)   In or around September 2020, Beacon Hill hired Lisette Robles, an Account Manager for Randstad Technologies.

96.    Through the course of its operations, Beacon Hill, led by Wang, has developed a program that is too consistent and uniform across its divisions to come from a source other than Beacon Hill's leadership.

97.    On information and belief, Beacon Hill instructs its external recruiters to convince candidates to interview by telling them that a non-compete is "not a problem" for this role, or something to that effect.

98.    Beacon Hill initially contacts Randstad candidates to discuss a position. If the candidate raises concerns about a non-compete, Beacon Hill will tell the candidate not to worry about any restrictive covenants, that the company will take care of them in any litigation, and that the candidate should focus on producing.

99.    During the recruitment process, Beacon Hill will not ask the employee for a copy of any restrictive covenant agreement. Beacon Hill therefore does nothing to attempt to comply with any applicable agreement even when it knows that the competitor, like Randstad, has its employees sign restrictive covenant agreements.

100.    If the candidate accepts an offer, Beacon Hill tells the employee to resign without notice to the candidate's current employer and to tell the candidate's main clients that they are leaving for a "growth opportunity" with a new company. The candidate is then advised to not change his or her LinkedIn profile, and Beacon Hill also tells the candidate to not tell his or her current employer that he or she is joining Beacon Hill. The candidate should then refrain from contacting clients for some period of time, then re-connect with their client. This delay also makes it less likely for the candidate's former employer to notice improper competitive activity

and act on it by filing a motion for a temporary restraining order or other preliminary injunctive relief.

101.    Beacon Hill has followed this program in Texas and across the United States. Despite Beacon Hill's actual and/or constructive knowledge of Randstad's Agreements with these individuals, yet it hired them in knowing violation thereof in an effort to interfere therewith and to compete unfairly by gaining access to and exploiting Randstad's confidential information, trade secrets, and customer goodwill, as well as to improperly and illegally solicit and encourage other Randstad employees to leave Randstad and to join Beacon Hill.

102.    Beacon Hill routinely hires Randstad employees and places them in positions with the same title (or the Beacon Hill equivalent of their Randstad title) in the same geographic territory, performing the same or substantially similar duties, including the following:

| Employee | Randstad Title | Beacon Hill Title | Location of Randstad and Beacon Hill Positions |
|---|---|---|---|
| Bailey Ulrich | Account Manager | National Account Manager | Charlotte, NC |
| Brittany Jeffries | Technical Recruiter | IT Staffing Consultant | Raleigh-Durham, NC |
| Daniel Blazek | Technical Recruiting Director | Senior Managing Consultant | Minneapolis, MN |
| Abbey Rose | Staffing Manager | Staffing Consultant | Nashville, TN |
| Ashley Hooper | Delivery Manager | Account Executive | Dallas, TX |
| Shauna Mooney | Branch Manager | Senior Managing Consultant | Dallas, TX |
| Shawna Bestreich | Vice President, Market Sales | Division Director | Dallas, TX |
| Jamie Ferguson | Director of Training, Sales | Learning and Development Manager | Raleigh-Durham, NC |
| Sam Major | Technical Lead: Client Engagement and Consulting | Client Engagement Consultant | Raleigh-Durham, NC |

103.    By pursuing this strategy, Beacon Hill is able to capitalize on premium talent in the marketplace and avoid the expenses and costs associated with training these employees and organically acquiring additional business in the marketplace.

104.    Beacon Hill's improper solicitations of Randstad employees are not limited to discrete hires. As noted above, in October 2017, Randstad filed two separate lawsuits against Beacon Hill arising out of Beacon Hill's raiding of the senior leadership of its RCS division. Prior to hiring Randstad's RCS leadership team, Beacon Hill did not have a Managed Services Program ("MSP"), which is a comprehensive program designed to support large companies with substantial staffing needs that extends well beyond traditional contingent workforce supplier management to cover full spectrum talent needs, including employee recruiting support, contractor retention programs, supplier engagement strategies and payrolling services. An MSP in the staffing industry refers to an outsourced agency that manages the contingent worker (temporary staffing) program of a client company. They ensure the smooth day-to-day operations of pulling requirements from clients, the preferred vendors submitting candidates, onboarding of selected candidates and the ongoing management of temporary workers at the client company for the duration of the contract.

105.    Rather than creating a managed services division organically, like Randstad had done, Beacon Hill stole RCS's top leadership and, indeed, its business model. Following an informal mediation, Randstad believed the parties had reached an agreement, only to have Beacon Hill renege on its agreements the following day and to spend the next several months attempting to get concession after concession from Randstad.[4]

---

[4] The parties were able to eventually reach an agreement despite Beacon Hill's best efforts to alter the terms of the deal the parties had agreed to at the informal mediation.

106.     That same pattern has repeated twice in different Beacon Hill divisions in the Dallas area. In the Beacon Hill Associates division, Bestreich successfully recruited at least two Randstad employees—Adams and Mooney[5]—and attempted to recruit others, to leave Randstad and join Beacon Hill. And after Randstad filed the Georgia Litigation, Beacon Hill hired Ashley Hooper, a Randstad Technologies employee, in a role that violates her restrictive covenant agreement.

### A.     Bestreich's Employment With Randstad and Employment Agreement

107.     Bestreich joined Randstad as the Vice President, Market Sales, on January 19, 2016. While employed by Randstad, Bestreich worked for Randstad in Dallas, Texas and, according to her own biography on Beacon Hill's website, "oversaw multiple divisions and office locations across Texas."

108.     As a condition of her employment, on January 16, 2016, Bestreich received and signed the Bestreich Agreement, which includes restrictions on Bestreich's ability to compete against Randstad, to solicit Randstad's customers, and to solicit Randstad's employees.

109.     On June 14, 2018, Bestreich resigned from Randstad. She claimed that she was dissatisfied with her role, but she did not inform Randstad that she was leaving to join a competitor.

110.     On or about June 18 2018, Bestreich began working as a Division Director for Beacon Hill in Dallas, Texas. Beacon Hill is a direct competitor to Randstad and specializes in office, clerical, light industrial, and information technology staffing services.

111.     On or about July 24, 2018, Randstad sent Bestreich and Wang a letter reminding them of Bestreich's obligations to Randstad. The letter included a copy of the Bestreich

---

[5] Beacon Hill also hired several other Randstad employees after they resigned from Randstad.

Agreement. Bestreich received the letter soon after Randstad sent it and forwarded it to Charlie Cain, a Managing Director, member of Beacon Hill's Executive Committee, and her direct supervisor. Cain admittedly did not review the letter closely or take any steps to ensure that Bestreich complied with her contractual obligations to Randstad. Neither Bestreich nor Beacon Hill responded to the letter.

112.    After Beacon Hill hired Bestreich, Beacon Hill knew that she was subject to the Bestreich Agreement because Randstad sent a cease and desist letter to Bestreich and to Wang and because Bestreich knew that she was subject to the Bestreich Agreement. Beacon Hill ignored the letter and continued to employ Bestreich in a position that violates the Bestreich Agreement.

113.    Beacon Hill did not take any action to prevent Bestreich from violating the Bestreich Agreement.

114.    As discussed above, Beacon Hill's status as a serial violator of restrictive covenant agreements, including Randstad's, indicate that Beacon Hill, notwithstanding these continuing obligations, hired and continued to employ Bestreich in a role that necessarily caused Bestreich to violate her obligations to Randstad. When hiring Bestreich, Beacon Hill followed its pattern or practice of ignoring and failing to inquire about whether a candidate is bound by restrictive covenants.

115.    Indeed, Bestreich's employment with Beacon Hill is a blatant violation of the non-compete covenant in Section 4(d) of the Bestreich Agreement, which expressly prohibits Bestreich from, among other activities, (i) "providing products or services competitive with the Business of the Company," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing

strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information."

116.    During Bestreich's employment with Beacon Hill, she solicited customers with whom she had material contact at Randstad and actually placed Talent with those customers.

117.    During Bestreich's employment with Beacon Hill, she had conversations with Randstad employees about leaving Randstad and/or joining Beacon Hill.

**B.    Adams's Employment With Randstad and Employment Agreement**

118.    Adams joined Randstad as a Staffing Manager - NCHC, on July 17, 2017. While employed by Randstad, Adams worked for Randstad in Dallas, Texas.

119.    As a condition of his employment, on July 17, 2017, Adams received and signed the Adams Agreement, which contains substantially similar provisions to the Bestreich Agreement.

120.    On or about September 21, 2018, Adams informed Randstad that he was resigning to join a competitor.

121.    On or about October 2018, Adams began working as a Senior Account Executive for Beacon Hill in Dallas, Texas. Beacon Hill is a direct competitor to Randstad and specializes in officer, clerical, and light industrial staffing services.

122.    Beacon Hill solicited and hired Adams with knowledge of Adams's continuing obligations to Randstad.

123.    Indeed, Bestreich both solicited and hired Adams and even signed his offer letter on behalf of Beacon Hill.

124.    At the time Beacon Hill hired Adams, Beacon Hill had actual or constructive knowledge that Adams was subject to the Adams Agreement because Beacon Hill is aware

Randstad requires employees to sign restrictive covenant agreements due to its repeated infringement of those agreements with other former employees.

125.    At the time Beacon Hill hired Adams, Beacon Hill had actual or constructive knowledge that Adams was subject to the Adams Agreement because Bestreich, an agent of Beacon Hill, knew that Adams was subject to the Adams Agreement, as she had signed the same agreement and knew that all non-California Randstad employees were subject to it, received discipline while employed at Randstad relating to taking action adverse to a restrictive covenant agreement, and received a cease and desist letter regarding the Bestreich Agreement.

126.    As discussed above, Beacon Hill's status as a serial violator of restrictive covenant agreements, including Randstad's, indicate that Beacon Hill, notwithstanding these continuing obligations, hired Adams in a role that caused Adams to violate his obligations to Randstad. When hiring Adams, Beacon Hill followed its pattern or practice of ignoring and failing to inquire about whether a candidate is bound by restrictive covenants.

127.    Indeed, Adams's employment with Beacon Hill was a blatant violation of the non-compete covenant in Section 4(d) of the Agreement, which expressly prohibits Adams from, among other activities, (i) "providing products or services competitive with the Business of the Company," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information."

### C.      Mooney's Employment With Randstad and Employment Agreement

128.     Mooney joined Randstad as an Account Manager in November 2014. While employed by Randstad, Mooney worked for Randstad in Dallas, Texas. Randstad later promoted Mooney to Senior Account Manager, Assistant Branch Manager, and Branch Manager.

129.     As a condition of her employment, on April 18, 2016, Mooney received and signed the Mooney Agreement, which contains substantially similar provisions to the Bestreich Agreement.

130.     On March 11, 2019, Bestreich and Beacon Hill learned that Randstad had filed the Georgia Litigation against them.

131.     The next day, Bestreich forwarded Mooney's resume to Charlie Cain with the following note: "Probably not the best timing with yesterday's news, but . . . !" Bestreich admitted that this was a reference to having received Randstad's lawsuit the prior day. In addition, Bestreich told Cain that Mooney "worked for me at Randstad an she was extremely impressive"; suggested that she was "not sure where [Mooney] would fit in at BH but wanted to forward her resume along to see if [Cain] may want to connect"; noted that Mooney "ran our [Randstad's] preferred team, and basically acted as an account manager/recruiter for national/strategic accounts"; and suggested that Mooney "could do an awesome job [at Beacon Hill] if she solely focused on growing our vms business . . . she may even be good for Kathleen's team." (Kathleen was a reference to Kathleen Keliher, another former Randstad employee that Beacon Hill had hired and who Randstad sued for violating her restrictive covenant agreement).

132.     On May 15, 2019, Bestreich again contacted Cain about hiring Mooney for a role at Beacon Hill, describing her as an "absolute rockstar" and requesting that Cain set up a time to speak with Mooney. Indeed, Bestreich further told Cain that Mooney "is miserable over at Randstad and is wanting to make a movie [sic]" and "really is strong, and I think she is the type

of person that would be a good fit/recruiting lead." Later that day, Bestreich connected Mooney and Cain by e-mail.

133.    On or about June 11, 2019, Beacon Hill extended an offer to Mooney for a role as a Senior Staffing Consultant. Wang prepared Mooney's offer letter, and Bestreich signed the offer letter extended the offer on behalf of Beacon Hill.

134.    On or about June 2019, Mooney informed Randstad that she was resigning to join a competitor. She did not inform Randstad that she would be joining Beacon Hill or that Bestreich solicited her to leave Randstad and join Beacon Hill.

135.    On or about June 2019, Mooney began working as a Senior Staffing Consultant for Beacon Hill in Dallas, Texas. Beacon Hill is a direct competitor to Randstad.

136.    Beacon Hill solicited and hired Mooney with knowledge of Mooney's continuing obligations to Randstad.

137.    At the time Beacon Hill hired Mooney, Beacon Hill had actual or constructive knowledge that Mooney was subject to the Mooney Agreement because Beacon Hill is aware Randstad requires employees to sign restrictive covenant agreements due to its repeated infringement of those agreements with other former employees.

138.    At the time Beacon Hill hired Mooney, Beacon Hill had actual or constructive knowledge that Mooney was subject to the Mooney Agreement because Bestreich, an agent of Beacon Hill, knew that Mooney was subject to the Mooney Agreement.

139.    As discussed in more detail below, Beacon Hill's status as a serial violator of restrictive covenant agreements, including Randstad's, indicate that Beacon Hill, notwithstanding these continuing obligations, hired Mooney in a role that caused Mooney to violate her obligations to Randstad. When hiring Mooney, Beacon Hill followed its pattern or

practice of ignoring and failing to inquire about whether a candidate is bound by restrictive covenants.

140.    Indeed, Mooney's employment with Beacon Hill is a blatant violation of the non-compete covenant in Section 4(d) of the Agreement, which expressly prohibits Mooney from, among other activities, (i) "providing products or services competitive with the Business of the Company," (ii) "supervising employees or other personnel who provide products or services competitive with the Business of the Company," (iii) developing or implementing strategies or methodologies related to products or services competitive with the Business of the Company," and; or (iv) "engaging in responsibilities in which Employee would utilize or disclose Confidential Information."

141.    And, again, Mooney's solicitation and hiring by Bestreich was a blatant violation of the Bestreich Agreement.

**D.    Hooper's Employment With Randstad and Employment Agreement**

142.    Hooper joined Randstad as a National Recruiter - Centralized Delivery on or about July 2017. Hooper received several promotions, ultimately obtaining the position of Delivery Manager - Centralized Delivery. Throughout her employment with Randstad, she worked in Randstad's office in Frisco, Texas.

143.    As a condition of her employment, on August 1, 2017, Hooper received and signed the Hooper Agreement, which contains substantially similar provisions to the Bestreich Agreement.

144.    On April 14, 2020, Hooper left Randstad. Hooper did not inform Randstad that she was leaving Randstad to join Beacon Hill.

145.     In or around June 2020, Hooper joined Beacon Hill as an Account Executive. Hooper works at Beacon Hill's Dallas, Texas office, which is located less than 25 miles from Randstad's Frisco office.

146.     On information and belief, Hooper's job duties for Beacon Hill are substantially similar to her job duties at her prior position with Randstad.

147.     In past litigation, including in the Georgia Litigation, Beacon Hill has refused to admit that it hired, continued to employ, and allowed employees to violate their restrictive covenants with Randstad even when faced with overwhelming evidence otherwise.

148.     Beacon Hill solicited and hired Hooper with knowledge of Hooper's continuing obligations to Randstad.

149.     At the time Beacon Hill hired Hooper, Beacon Hill had actual or constructive knowledge that Hooper was subject to the Hooper Agreement because Beacon Hill is aware Randstad requires employees to sign restrictive covenant agreements due to its repeated infringement of those agreements with other former employees.

150.     On information and belief, Wang prepared Hooper's offer letter and was aware that Hooper was a Randstad employee at the time he extended an offer to her.

151.     As discussed above, Beacon Hill's status as a serial violator of restrictive covenant agreements, including Randstad's, indicate that Beacon Hill, notwithstanding these continuing obligations, hired Hooper in a role that caused Hooper to violate her obligations to Randstad.

152.     Despite Randstad's efforts to enforce its agreements, including the hires discussed above, Beacon Hill continues to interfere with Randstad's restrictive covenant agreements and similar agreements executed by other companies. Beacon Hill has clearly made a decision to

39

view restrictive covenant litigation as nothing more than a cost of doing business and the price to obtain customers and business strategies without the expense of developing those relationships or strategies. As a result, Randstad has been forced to bring this lawsuit to seek the Court's assistance in securing Beacon Hill's recognition of Randstad's agreements and to amend the Complaint to include individuals hired while the original lawsuit was pending.

<u>**COUNT I**</u>
**Intentional Interference With Contractual Relations – Randstad Employees**
**(Against Beacon Hill)**

153.    Randstad repeats and re-alleges Paragraphs 1–152 above, and incorporates them as if fully set forth herein.

154.    Randstad has valid and enforceable contractual relationships with its employees, including, without limitation, the Beacon Hill Hires, by virtue of their restrictive covenant agreements with Randstad. Indeed, numerous courts have entered injunctions upholding Randstad's restrictive covenant agreements. *See, e.g.*, *Randstad Techs., LLC v. Lisette Robles*, No. 2020-0105987 (Ga. Super. Ct., Cobb Cty.) (Sept. 30, 2020); *Randstad Techs., LLC v. Luma,* et al., No. 18106542 (Ga. Super. Ct., Cobb Cty.); *Randstad General Partner (US), LLC v. Volt Workforce Solutions, LLC*, No. 17108166 (Ga. Super. Ct., Cobb Cty.), *Randstad Professionals US, LLC v. Joseph Tamberrino,* et al., No. 1:18-cv-940-ELR (N.D. Ga.).

155.    During their employment with Randstad, the Beacon Hill Hires either Customarily and regularly solicited customers or prospective customers, customarily and regularly engaged in making sales or obtaining orders or contracts for products or services to be performed by others, or managed a subdivision of Randstad, regularly directed the work of two or more employees, and had the authority to hire or fire other employees or had particular weight given to their suggestions or recommendations regarding changes to employment status.

156.     Randstad had a reasonable expectation that these contractual relationships would continue and that its employees including, without limitation, the Beacon Hill Hires, would comply with the provisions of the Agreements.

157.     Beacon Hill had knowledge of Randstad's Agreements with its employees, including, *without limitation*, the Beacon Hill Hires.

158.     Beacon Hill, by its involvement in litigation with Randstad, including the Georgia Litigation, and other companies in the staffing industry, knew or should have known that Randstad had valid and enforceable restrictive covenant agreements, and, despite its active or constructive knowledge, chose to interfere with Randstad's agreements, resulting in willful and intentional acts of interference with Randstad's restrictive covenant agreements.

159.     Specifically, Beacon Hill hires Randstad personnel and places them in positions in the same territory performing the same or substantially similar job functions. Beacon Hill also encourages former Randstad employees to call on their former clients and/or fails to take any measures to prevent the employees from soliciting their former clients. In doing so, Beacon Hill violates the non-competition restrictions in the above-referenced employees' agreements.

160.     Beacon Hill has, through its leadership, including Wang, made a calculated decision to breach restrictive covenant agreements to acquire premium talent in the marketplace while foregoing the need to develop and train employees at its own expense.

161.     Beacon Hill has consciously chosen to not implement a restrictive covenant screening program or to take other measures that would allow it to avoid violating restrictive covenants. Indeed, despite being repeatedly sued by Randstad, Beacon Hill continues to hire Randstad employees and place them in roles that violate Randstad's restrictive covenant agreements.

162.    By the acts described above, Beacon Hill has intentionally interfered with Randstad's contractual relationships with its employees, including, *without limitation*, the Beacon Hill Hires.

163.    Beacon Hill knew or should have known that offering employment to its employees, including, without limitation, the Beacon Hill Hires, and continuing to employ them in positions that violated their restrictive covenant agreements would, and did in fact induce Randstad's employees, including, *without limitation*, the Beacon Hill Hires, to violate their respective agreements. Specifically, Beacon Hill hires Randstad employees and places them in the same market and encourages them to solicit their former customers. In doing so, Beacon Hill affirmatively and intentionally encourages its Randstad hires to breach their non-competition and non-solicitation obligations.

164.    Beacon Hill also directed, authorized, encouraged, or ratified improper and illegal solicitations of Randstad customers and employees.

165.    By the acts described above, Beacon Hill had an improper motive and used improper means in interfering with Randstad's contractual relations without lawful justification or legitimate reason for this interference with those contracts. Beacon Hill's leadership, including Wang and Charlie Cain, have stated or implied that they do not care about complying with restrictive covenant agreements. The reason for their disregard for restrictive covenants is that Beacon Hill believes that it is more efficient and profitable to hire employees without regard to restrictive covenants rather than consider them when making hiring determinations.

166.    As a direct and proximate result of Beacon Hill's actions described above—which is *not* limited to the Beacon Hill hires—Randstad has suffered and continues to suffer irreparable harm and monetary damages.

167.    By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

168.    This claim is not limited to the Beacon Hill Hires, but expressly excludes any hiring where Randstad executed a settlement agreement between it and Beacon Hill.

**COUNT II**
**Intentional Interference With Contractual Relations - Mooney**
**(Against Bestreich)**

169.    Randstad repeats and re-alleges Paragraphs 1-152 above, and incorporates them as if fully set forth herein.

170.    Randstad has a valid and enforceable contractual relationship with Mooney by virtue of her restrictive covenant agreement with Randstad.

171.    Randstad had a reasonable expectation that its contractual relationship with Mooney would continue and that Mooney would comply with the provisions of her Agreement.

172.    Bestreich had knowledge of Randstad's Agreement with Mooney.

173.    By the acts described above, Bestreich has intentionally interfered with Randstad's contractual relationship with Mooney and willfully and intentionally interfered with Mooney's Agreement.

174.    Bestreich knew or should have known that encouraging and assisting Mooney in obtaining a position that violated her restrictive covenant agreements would, and did in fact induce, Mooney to violate her Agreement.

175.    By the acts described above, Bestreich had an improper motive and used improper means in interfering with Randstad's contractual relations without lawful justification or legitimate reason for this interference with this contract.

176.    Bestreich's conduct, as alleged herein, was willful and intentional.

177.    As a direct and proximate result of Bestreich's actions described above, Randstad has suffered and continues to suffer irreparable harm and monetary damages.

## COUNT III
### Intentional Interference With Contractual Relations - Randstad Employees
### (Against Wang)

178.    Randstad repeats and re-alleges Paragraphs 1-152 above, and incorporates them as if fully set forth herein.

179.    Randstad has valid and enforceable contractual relationships with its employees, including, *without limitation*, the Beacon Hill Hires, by virtue of their restrictive covenant agreements with Randstad. Indeed, numerous courts have entered injunctions upholding Randstad's restrictive covenant agreements. *See, e.g.*, *Randstad Techs., LLC v. Lisette Robles*, No. 2020-0105987 (Ga. Super. Ct., Cobb Cty.) (Sept. 30, 2020); *Randstad Techs., LLC v. Luma,* et al., No. 18106542 (Ga. Super. Ct., Cobb Cty.); *Randstad General Partner (US), LLC v. Volt Workforce Solutions, LLC*, No. 17108166 (Ga. Super. Ct., Cobb Cty.), *Randstad Professionals US, LLC v. Joseph Tamberrino,* et al., No. 1:18-cv-940-ELR (N.D. Ga.).

180.    Randstad had a reasonable expectation that these contractual relationships would continue and that its employees including, *without limitation*, the Beacon Hill Hires, would comply with the provisions of the Agreements.

181.    Wang had knowledge of Randstad's Agreements with its employees, including, without limitation, the Beacon Hill Hires.

182.    Wang  also has knowledge of Courts' entering injunctions upholding Randstad restrictive covenant agreements.

183. Wang knowingly extends employment to Randstad employees, including the Beacon Hill Hires, with full knowledge that they are being placed in positions that violate their restrictive covenants.

184. Wang has also created or fostered a growth strategy at Beacon Hill that requires or heavily depends on violating restrictive covenant agreements. Wang plays a significant role in Beacon Hill's extensive violations of restrictive covenants, as evidenced by the fact that Beacon Hill's conduct is the same across its ostensibly separate divisions.

185. Wang has made a deliberate choice to interfere with Randstad's restrictive covenant agreements. Wang has received numerous cease and desist letters from Randstad, because Wang prepares offer letters to all Beacon Hill employees, and because Wang nonetheless continues to hire Randstad employees in positions that clearly violate their restrictive covenant agreements. Wang has also continued to pursue a growth strategy that prizes growth above compliance with restrictive covenant agreements.

186. By his actions, Wang has personally directed or participated in the tortious conduct described above or otherwise acted as the "guiding spirit" in causing Beacon Hill to tortiously interfere with Randstad's restrictive covenant agreements.

187. Wang, because of his past involvement in restrictive covenant litigation with Randstad, including the Georgia Litigation, and cases filed by or against other companies in the staffing industry, knew or should have known that Randstad had valid and enforceable restrictive covenant agreements, and, despite his active or constructive knowledge, chose to interfere with Randstad's agreements.

188. By the acts described above, Wang has intentionally interfered with Randstad's contractual relationships with its employees, including, *without limitation*, the Beacon Hill Hires.

189.    Wang knew or should have known that offering employment to its employees, including, *without limitation*, the Beacon Hill Hires, and continuing to employ them in positions that violated their restrictive covenant agreements would, and did in fact induce Randstad's employees, including, without limitation, the Beacon Hill Hires, to violate their respective agreements.

190.    Wang also knew or should have known that his policy or practice of achieving growth at any cost and refusing to implement any screening measures to identify and avoid violating Randstad's restrictive covenants.

191.    Wang also directed, authorized, encouraged, or ratified improper and illegal solicitations of Randstad customers and employees through, on information and belief, instructions to his direct reports and through Beacon Hill's approach to hiring.

192.    By the acts described above, Wang engaged in willful and intentional acts of interference with Randstad's restrictive covenant agreements.

193.    As a direct and proximate result of Beacon Hill's actions described above, Randstad has suffered and continues to suffer irreparable harm and monetary damages.

## COUNT IV
**Intentional Interference With Existing Business Relations - Customers**
**(Against Beacon Hill)**

194.    Randstad repeats and re-alleges Paragraphs 1–152 above, and incorporates them as if fully set forth herein.

195.    As described in detail above, Beacon Hill, without privilege, engaged in improper and wrongful conduct by employing former Randstad employees, including, *without limitation*, the Beacon Hill Hires, and directing or encouraging them to solicit customers, in violation of their restrictive covenant agreements with Randstad.

196.     Beacon Hill acted purposefully, with malice, and with intent to injure Randstad when it hired and continued to employ Randstad's employees, including, *without limitation*, the Beacon Hill Hires. As a result of Beacon Hill's inducement, Beacon Hill caused Randstad customers to discontinue, to fail to enter, and/or to reduce their business with Randstad.

197.     Beacon Hill directs candidates to end their employment with Randstad in a way that is calculated to disrupt the relationship between Randstad and its clients. For example, Beacon Hill coaches new hires to leave without notice in an effort to disrupt Randstad's client relationships and impair the likelihood of a smooth transition, in an effort to harm Randstad's relationship with any impacted customers.

198.     Beacon Hill acted purposefully, with malice, and with intent to injure Randstad.

199.     By the acts described above, Beacon Hill had an improper motive and used improper means in interfering with Randstad's business relationships and expectations.

200.     As a direct and proximate result of Beacon Hill's actions described above, Randstad has suffered and continues to suffer irreparable harm and monetary damages.

## COUNT V
**Intentional Interference With Business Relations - Customers
(Against Wang)**

201.     Randstad repeats and re-alleges Paragraphs 1-152 above, and incorporates them as if fully set forth herein.

202.     As described in detail above, Wang, without privilege, engaged in improper and wrongful conduct by employing former Randstad employees, including, *without limitation*, the Beacon Hill Hires, and directing or encouraging them to solicit customers, in violation of their restrictive covenant agreements with Randstad.

47

203.    Wang has also either created or played a critical role in Beacon Hill's standard separation protocol, which is designed to disrupt the relationship between Randstad and the client.

204.    Wang acted purposefully, with malice, and with intent to injure Randstad when it hired and continued to employ Randstad's employees, including, *without limitation*, the Beacon Hill Hires and by continuing to direct or coordinate Beacon Hill's nationwide program of disregarding or knowingly ignoring restrictive covenants. As a result of Wang's inducement, Beacon Hill caused Randstad customers to discontinue, to fail to enter, and/or to reduce their business with Randstad.

205.    Wang acted purposefully, with malice, and with intent to injure Randstad.

206.    By the acts described above, Wang had an improper motive and used improper means in interfering with Randstad's business relationships and expectations.

207.    As a direct and proximate result of Wang's actions described above, Randstad has suffered and continues to suffer irreparable harm and monetary damages.

208.    By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

### COUNT VI
### Unfair Competition
### (Against Beacon Hill and Wang)

209.    Randstad repeats and re-alleges Paragraphs 1-152 above, and incorporates them as if fully set forth herein.

210.    Beacon Hill's and Wang's acts and omissions described above constitute unfair competition.

211.    Beacon Hill, led by its CEO, organized a scheme to raid Randstad's employees as a means to improperly and illegally acquire Randstad's workforce, its customers, and its goodwill, in order to harm Randstad in the marketplace so that Beacon Hill could unfairly compete against Randstad. This scheme, including solicitation of Randstad's employees, was undertaken with unlawful and improper purpose, and employed unlawful and improper means. Beacon Hill's and Wang's conduct was contrary to honest practices in industrial or commercial matters, as evidenced by its status as a serial defendant in restrictive covenant litigation.

212.    Until Beacon Hill and Wang carried out this scheme, Randstad maintained valid relationships, or the expectancy of relationships, with their customers and employees. Randstad reasonably expected that these relationships and its work force would continue and would not be unjustifiably disrupted.

213.    Randstad has been competitively and commercially damaged as a proximate result of the acts and omissions of unfair competition committed by Beacon Hill. Specifically, there was a reasonable probability of entering into contractual or business relationships with third parties, but those prospective business relationships were disrupted by Beacon Hill's and Wang's actions.

214.    Beacon Hill's and Wang's conduct has been willful and in bad faith.

215.    Beacon Hill's and Wang's conduct has caused and is causing irreparable injury to Randstad. Unless enjoined by this Court, Beacon Hill will continue to damage Randstad. Randstad has no adequate remedy at law with respect to Beacon Hill's and Wang's acts of unfair competition.

## <u>REQUEST FOR EXEMPLARY DAMAGES</u>
### (Against All Defendants)

216.    Randstad repeats and re-alleges Paragraphs 1 through 152 above, and incorporates them as if fully set forth herein.

217.    Defendants' actions have been willful and malicious and were intended to harm Defendants and were in reckless disregard of Randstad's rights and of the consequences to Randstad. Beacon Hill has acted with the specific intent to harm Randstad by hiring Randstad employees to perform the same duties in the same territory without taking any measures to comply with their restrictive covenant agreements, by refusing to implement any form of restrictive covenant screening, and by recommending to its new hires that they leave Randstad with minimal notice to disrupt existing relations between Randstad and its clients.

218.    Therefore, Randstad is entitled to exemplary damages against Defendants to deter such improper conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Randstad prays that this Court:

1.      Enter judgment in Randstad's favor and against Defendants, jointly and severally, where applicable, for all damages that may be calculated that Randstad may recover as a result of Defendants' misconduct, including, without limitation, compensatory and exemplary or punitive damages in an amount to proven at trial;

2.      Award attorneys' fees, costs and expenses as allowed by law;

3.      Enter permanent equitable relief enjoining Defendants from any further breaches of contract and tortious interference with Randstad's contracts and business relationships; and

4.      Grant such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

**RANDSTAD DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.**

Respectfully submitted,

/s/ Robert C. Stevens

Dawn Estes
State Bar No. 14251350
Terah Moxley
Texas Bar No. 24074768
ESTES THORNE & CARR PLLC
3811 Turtle Creek Blvd
Suite 2000
Dallas, Texas 75219
destes@estesthornecarr.com
tmoxley@estesthornecarr.com
Telephone: (214) 599-4000
Facsimile: (214) 599-4099

Of Counsel

Robert C. Stevens (Georgia Bar No. 680142)
(*Admitted pro hac vice*)
bstevens@seyfarth.com
Alex Meier (Georgia Bar No. 282350)
ameier@seyfarth.com
(*Admitted pro hac vice*)
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

Erik W. Weibust
(*Admitted pro hac vice*)
eweibust@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: (617) 946-4800
Facsimile: (617) 946-4801

*Counsel for Plaintiffs Randstad General Partner
(US), LLC and Randstad Technologies, LLC*

Dated: November 5, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2020, I electronically filed the above document and a copy will be served on all counsel via the Court CM/ECF website, including the following counsel of record:

Benjamin I. Fink
Lea C. Dearing
BERMAN FINK VAN HORN P.C.
3475 Piedmont Road, N.E.
Suite 1100
Atlanta, Georgia 30305
bfink@bfvlaw.com
ldearing@bfvlaw.com


*/s/ Robert C. Stevens*
Robert C. Stevens

66476212v.5